Order, Supreme Court, Bronx County (Diane A. Lebedeff, J.), entered August 26, 2011, which granted the motion of defendants Dr. Salvatore Conte (Dr. Conte), Salvatore Conte, M.D., EC., and Conte and Matfus, 3VLD., EC. to set aside the jury verdict and grant a new trial, reversed, on the facts, without costs, and the motion denied.
In this wrongful death action predicated on medical malpractice, the jury heard testimony from plaintiffs oncology expert that the decedent’s long-term primary care practitioner, defendant Dr. Conte, deviated from accepted medical standards when, upon the decedent’s return to Dr. Conte’s practice in February 2001, after a 21-month absence, with complaints of pain and other abdominal symptoms, he diagnosed her with irritable bowel syndrome (IBS), without referring her for an abdominal CT scan or a gastrointestinal (GI) work-up (which would have included the scan), so as to exclude other conditions, and that *482 these diagnostic tests would likely have detected the presence of the tumor in the upper left quadrant of the abdomen. Due to this failure, the tumor was not definitively identified until March 2002, when the decedent returned from her native Jamaica with a positive abdominal sonogram, and Dr. Conte immediately referred her for a CT scan, which confirmed the mass. Plaintiffs expert also opined that, based on this extended delay, the decedent was deprived of the opportunity for a cure, defined as five years’ survival without the disease, insofar as her tumor was much smaller at the time of her first complaints and would likely have been completely surgically resectable and amenable to treatment. By the time of the eventual surgery in May 2002, the tumor had become so massive, and invaded so many organs, that it was only partially resected, and, despite several years of oncological treatment, the decedent died in September 2007.
While the defense took the position that the decedent failed to inform Dr. Conte of complaints that would have justified his directing a GI work-up or abdominal scan, the jury was entitled to reject Dr. Conte’s testimony to that effect, and to accept instead the decedent’s assertion, recorded in her videotaped deposition testimony, that she reported complaints of excruciating stomach pain at each visit. Similarly, the jury could reject Dr. Conte’s testimony that he first palpated an abdominal mass in September 2001 and advised the decedent to undergo GI testing, and that she steadfastly refused to do so; that testimony, too, was flatly contradicted by the decedent’s deposition testimony.
The dissent concludes that the weight of the evidence establishes that nothing in Dr. Conte’s conduct could have caused the decedent’s early death, since nothing he could have done would have prevented her death at that time. It emphasizes the defense evidence asserting that the decedent’s tumor was of a particular type, an EGIST (extra-gastrointestinal stromal tumor), which generally evades early detection when small and asymptomatic, and only causes symptoms once it grows large (which it does quickly). According to this theory, any CT scan or GI work-up ordered by Dr. Conte in February 2001 would have had no impact on the development of her tumor and her eventual death.
However, the testimony offered by Dr. Conte and defense experts in this regard is not absolute fact, but merely evidence that the jury was free to disregard if other, contrary evidence was more convincing. Both plaintiffs expert and the radiologist who interpreted the March 2002 CT scan testified unequivocally that the tumor was of a different type, a GIST (gastrointestinal *483 stromal tumor), which originated in the gastrointestinal tract and would have produced symptoms very early on, while it was smaller and much more amenable to resection and treatment. The jury was also informed of a report by the decedent’s doctor at a cancer treatment facility stating that the surgeon’s and the pathologist’s diagnosis of the more fatal tumor was incorrect, and that the other diagnosis rendered by plaintiffs expert and the first radiologist was correct. In addition, there are multiple instances in the decedent’s records of the surgeon’s and another of the decedent’s oncologists’ referring to the tumor as the more treatable GIST-type that causes early symptoms and can be effectively treated.
The dissent suggests that plaintiff’s expert oncologist was shown to be wrong because if the tumor had been a GIST, the decedent would have been in substantial pain between February 2001 and September 2001, and “would have followed Dr. Conte’s advice in September and October 2001 and submitted to an intestinal work-up.” However, the decedent stated that she was in substantial pain and that Dr. Conte did not give her any such advice, ultimately leading her to obtain a second opinion when she went to Jamaica in March 2002.
“The question of whether a verdict is against the weight of the evidence is discretion-laden, and the critical inquiry is whether the verdict rested on a fair interpretation of the evidence” (Gartech Elec. Contr. Corp. v Coastal Elec. Constr. Corp., 66 AD3d 463, 480 [1st Dept 2009], appeal dismissed 14 NY3d 748 [2010]). On this record, we conclude that the Supreme Court erred in setting aside the verdict as against the weight of the evidence, because it cannot be said that the jury could not have reached its verdict upon any fair interpretation of the evidence (see Bennett v Wolf, 40 AD3d 274 [1st Dept 2007], lv denied 9 NY3d 818 [2008]). The jury was entitled to resolve in plaintiffs favor the conflict between the decedent’s and Dr. Conte’s testimony as to the nature and timing of her complaints and whether he later made referrals for CT scans that she declined.
The dissent observes that in granting defendants’ CPLR 4404 (a) motion, the trial court differed from the jury regarding the relative credibility of the decedent and plaintiffs expert, as opposed to that of Dr. Conte and his experts. However, since in our view, a “fair interpretation of the evidence” supports the jury’s verdict, the trial court’s contrary assessment does not justify a new trial.
This case essentially came down to a battle of the experts with respect to the standard of care and the type of tumor at issue and whether it could have caused symptoms at the time of *484 the alleged departure, thus raising an issue of credibility peculiarly within the province of the jury (see Briggins v Chynn, 204 AD2d 158 [1st Dept 1994]), whose determination should be afforded great deference (Nicastro v Park, 113 AD2d 129, 136 [2d Dept 1985]).
Insofar as Dr. Conte has challenged the sufficiency of the evidence underpinning the awards of compensation to the decedent’s adult children, we find that the testimony as to the nurture, care, and guidance provided by the decedent to all of the children, in particular the care-taking services rendered to her handicapped son, was adequate to support their respective awards (see e.g. Gonzalez v New York City Hous. Auth., 77 NY2d 663 [1991]; Zygmunt v Berkowitz, 301 AD2d 593 [2d Dept 2003]). We further note that defendant does not challenge the $325,000 award for the decedent’s pain and suffering. Concur— Tom, J.P., Acosta, Saxe and Feinman, JJ.
Freedman, J., dissents in a memorandum as follows: I would affirm the trial court’s order under CPLR 4404 (a) setting aside the jury verdict against defendant Salvatore Conte, M.D., and directing a new trial. I believe the verdict was against the weight of the evidence as to the only issue submitted to the jury, namely, whether Dr. Conte should have ordered a CT scan for plaintiffs decedent, Hermine Browne, when he saw her on February 17, 2001, and, if so, whether Dr. Conte’s failure to order the test substantially contributed to the decedent’s death from cancer in September 2007 and her pain and suffering before her demise.
After a CT scan in March 2002, the decedent was diagnosed with an extra-gastrointestinal stromal tumor (EGIST), a rare type of cancer arising in the retroperitoneum and other soft abdominal tissue surrounding the gastrointestinal tract. In this action for medical malpractice and wrongful death, plaintiff claims that Dr. Conte was negligent when he failed to order a CT scan in February 2001 because the EGIST could have been diagnosed then and because an earlier diagnosis could have reduced her pain and suffering before death and might have prolonged her life.
After a lengthy trial, the jury returned a 5-1 verdict against Dr. Conte, finding that he departed from accepted standards of medical care by not ordering the CT scan and that such departure was a proximate cause of the decedent’s injuries. Curiously, and somewhat inconsistently, the jury unanimously found in favor of Fhilip Klepper, M.D., a pulmonologist who also did not order a CT scan for the decedent when he saw her in July 2001. The jury awarded plaintiff a total of $800,000 in damages, which included $325,000 for the decedent’s pain and *485 suffering and economic loss damages for family members that totaled $475,000.
Dr. Conte moved under CPLR 4404 (a) for an order setting aside the jury verdict and directing a new trial. The trial court granted the motion, finding that the verdict was against the weight of the evidence.
The following was adduced at trial: Beginning in 1987, the decedent regularly saw defendant Dr. Salvatore Conte, an internist, for a number of routine ailments, including high blood pressure, irritable bowel syndrome (IBS), and shortness of breath. After a 21-month hiatus, from May 1999 to February 2001, during which the decedent saw another doctor, she returned to Dr. Conte and thereafter saw him regularly. According to Dr. Conte’s examination notes and trial testimony, at the February 2001 visit, the decedent, then 58, presented with increased blood pressure and decreased hearing, and complained of anxiety and, in her own words, “abdominal gas.” Dr. Conte performed a comprehensive physical examination including abdominal palpation, and performed and ordered various laboratory tests, including an EKG, a chest X ray, a spirometry test, and an audiogram. Dr. Conte’s notes indicated that the decedent’s abdomen was soft and her lungs were clear, but she had a number of chronic medical problems, including elevated cholesterol and IBS. For the decedent’s abdominal discomfort, Dr. Conte prescribed Famine, a drug used to treat ulcers, and recommended a change of diet.
Two weeks later, on March 3, 2001, the decedent reported to Dr. Conte that she felt much better, and did not complain about abdominal discomfort. Dr. Conte again palpated her abdomen and found it soft. Thereafter the decedent visited Dr. Conte on April 27, May 12, May 26, June 23, and August 8, 2001. Dr. Conte’s examination notes for those visits indicated that her abdomen remained soft and non-tender. On the May 12 visit, Dr. Conte referred her to Dr. Klapper because he was concerned about breathing difficulties. Dr. Klapper performed a battery of pulmonary function tests in July 2001 and January 2002, all of which were negative.
On September 21, 2001, Dr. Conte for the first time detected a non-tender “fullness” in the left upper quadrant of the decedent’s abdomen. Dr. Conte’s notes and trial testimony indicated that he could not determine the mass’s size or dimension, but he informed the decedent about it and referred her to a gastroenterologist for testing, including a CT scan and abdominal sonogram. However, the decedent refused the referral. On October 5 and December 5, 2001, and January 16 and February *486 16, 2002, Dr. Conte continued to detect abdominal fullness, but, according to his notes, the decedent refused his repeated advice that she go for a full gastrointestinal work-up, including a CT scan.
In his January 16, 2002 notes, Dr. Conte described the fullness as a non-tender “questionable mass.” On February 16, Dr. Conte noted that the abdomen was still soft, but the mass was palpable.
On March 20, 2002, the decedent saw a gynecologist in Jamaica who performed a sonogram and detected an abdominal mass. When the decedent returned from Jamaica, she provided the sonogram results to Dr. Conte, who in March 26 referred her for a CT scan with contrast, which detected a large mass. The radiologist who interpreted the CT scan results, Dr. Ralph Lichenstein, reported that the mass “possibly arose from [the] posterior wall of the stomach,” which would classify the mass as a gastrointestinal stromal tumor (GIST), a type of cancer that grows directly from the gastrointestinal tract and is much more common than an EGIST.
After the diagnosis, Dr. Conte referred the decedent to Dr. Robert Plummer, a general surgeon, who first saw the decedent on March 28 and referred her for an endoscopy and colonoscopy. Neither test detected any mucosal disease or other evidence of a tumor within the gastrointestinal tract, but they detected an external mass causing pressure on the decedent’s stomach. On May 6, 2002, Dr. Plummer performed an exploratory laparoscopy to examine the tumor, and removed a large portion of it. Dr. Plummer testified with a reasonable degree of medical certainty that the tumor was an EGIST that grew from the retroperitoneum, and not a GIST growing from the stomach or other vital organs. The pathologist who biopsied the tumor, Dr. James Pullman, also diagnosed an EGIST.
Following the May 2002 surgery, Dr. Plummer referred the decedent to an oncologist for treatment of an EGIST arising from the retroperitoneum. In fact, the decedent sought a second opinion from Memorial Sloan-Kettering Cancer Center after her surgery; the examination note indicated an “impression” that the tumor “apparently ar[ose] from the retroperitoneum.”
The oncologist treated the decedent until her death in September 2007, 6V2 years after February 2001.
Plaintiff presented the decedent’s videotaped deposition testimony. The decedent testified that, at each visit with Dr. Conte from February 2001 onward, she complained to him of excruciating stomach pain. The decedent further testified that Dr. Conti did not advise her at the September 2001 visit that he *487 had palpated an abnormality in her abdomen and did not advise her to undergo GI testing.
Plaintiff also presented one expert witness, oncologist Barry Singer, M.D., in support of her one claim that Dr. Conte’s failure to order a CT scan in February 2001 was a departure that proximately caused either greater morbidity or earlier death. Although plaintiffs expert disclosure stated that in Dr. Singer’s opinion Dr. Conte was liable for not taking steps to diagnose or rule out an EGIST, at the trial Dr. Singer testified that the decedent suffered from a GIST, and insisted that it could have been detected in February 2001. This testimony by Dr. Singer, who had never treated the decedent or any other patient suffering from an EGIST, conflicts with the conclusion of the decedent’s surgeon, attending pathologist, and oncologist that she suffered from an EGIST. The difference is significant because, as the jury learned through extensive testimony, a GIST grows directly from the gastrointestinal tract and implicates the organs’ nerve endings. Typically, a GIST is diagnosed when smaller because it implicates the organs’ nerves and often causes excruciating pain, blockage, and bleeding. An EGIST, which arises in soft tissue, generally evades early detection when small because it is ordinarily an asymptomatic, “silent” tumor. An EGIST tends to grow quickly, however, and generally does not begin to cause serious symptoms until it is already very large. Accordingly, the nature of the decedent’s tumor is relevant to whether Dr. Conte’s failure to order a CT scan could have been a departure, let alone could have caused earlier death or additional morbidity.
The court properly found that the verdict against Dr. Conte was against the weight of the evidence presented. Generally, a jury verdict should not be set aside under CPLR 4404 (a) unless it could not have been reached “on any fair interpretation of the evidence” (e.g. Nicastro v Park, 113 AD2d 129, 134 [2d Dept 1985] [internal quotation marks omitted]). Even if the prevailing party proffers legally sufficient evidence, the verdict may still be set aside if the evidence as a whole weighs heavily in the losing party’s favor (see Lolik v Big V Supermarkets, 86 NY2d 744, 746 [1995]). A trial court’s determination that the verdict is against the weight of the evidence “is essentially a discretionary and factual determination” within the scope of the court’s professional judgment (Yalkut v City of New York, 162 AD2d 185, 188 [1st Dept 1990]; see Fisk v City of New York, 74 AD3d 658 [1st Dept 2010]).
The majority asserts that the decedent’s deposition testimony creates an issue of fact whether, at the critical February 2001 *488 visit and thereafter, the decedent complained to Dr. Conte of excruciating stomach pain. However, the trial judge who heard the evidence clearly disbelieved the decedent’s testimony about this excruciating pain because of the overwhelming evidence that Dr. Conte was a thorough physician who would not have ignored a patient’s complaint of severe pain. Dr. Conte took detailed written notes during the decedent’s visits. In none of his notes does Dr. Conte indicate that she had excruciating stomach pain. Instead, Dr. Conte’s notes indicate that in February 2001 the decedent complained of abdominal gas, for which he prescribed medication, and at the next visit in March 2001 she reported feeling much better. Moreover, Dr. Conte took measures to address a number of the decedent’s conditions, including prescribing medication for elevated blood pressure and cholesterol levels, and referring her to a pulmonologist for medical tests in connection with breathing problems.
The majority also finds that the decedent’s testimony raises an issue whether, in September 2001, Dr. Conte advised her to undergo GI testing after he palpated an abdominal mass, although his notes indicate that he did. But that issue is irrelevant. The only question before the jury was whether Dr. Conte committed malpractice by failing to order a CT scan when he saw the decedent in February 2001.
The trial court, having heard all the testimony, was also more than justified in discounting Dr. Singer’s opinion because it conflicted in a number of ways with the bulk of the evidence that was introduced at trial. The decedent’s treating surgeon, pathologist, and oncologist and plaintiffs own expert, according to his expert disclosure, all indicated that the decedent suffered from an EGIST, in contrast with Dr. Singer’s finding that she suffered from a GIST.
Dr. Singer maintained at trial that the decedent had a diagnosable GIST in February 2011, but in that case the decedent would have followed Dr. Conte’s advice in September and October 2001 and submitted to an intestinal work-up. The decedent’s testimony that she informed Dr. Conte that she was in great pain but he did not advise her to have an intestinal work-up is, as already noted, simply not credible.
Moreover, Dr. Singer did not show with reasonable medical certainty that the departure was a proximate cause of the decedent’s injuries (see Rivera v Greenstein, 79 AD3d 564, 568 [1st Dept 2010]; Alvarado v Miles, 32 AD3d 255, 257 [1st Dept 2006], affd 9 NY3d 902 [2007]). “Competent medical proof as to causation is . . . essential” (Rivera at 568; Stanski v Ezersky, 228 AD2d 311, 312 [1st Dept 1996], lv denied 89 NY2d 805 *489 [1996]), and an expert’s “conclusory assertions and mere speculation that a doctor could have discovered the condition and successfully treated the patient” is insufficient (Rivera at 568).
Here, Dr. Singer offered no evidence that if Dr. Conte had recommended a CT scan or a sonogram in February 2001, slightly more than a year earlier than the May 2002 CT scan, the decedent would have had a better outcome. Dr. Singer speculated that, with earlier detection, the decedent might have lived longer and Dr. Plummer could have entirely removed the tumor, but he also acknowledged that the tumor could recur. Dr. Singer further testified that if the tumor had been diagnosed and resected earlier, and the decedent had been treated with the drug Gleevec, she would have lived five years without symptoms. However, as was demonstrated, Gleevec was unavailable until 2002, and in any event the decedent lived more than six years after Dr. Conte’s alleged departure.
For the reasons set forth above, I would not disturb the trial court’s provident exercise of its discretion in setting aside the verdict and ordering a new trial.